**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, )<br>RUBBER, MANUFACTURING, ENERGY, )<br>ALLIED INDUSTRIAL AND SERVICE )<br>WORKERS INTERNATIONAL UNION, )<br>                                                                      )<br>          Plaintiffs,                                   )<br>                                                                      )<br>     v.                                                          )<br>                                                                      )<br>TRIMAS CORPORATION,                   )<br>                                                                      )<br>          Defendant.                                  )  | CAUSE NO.: 1:06-CV-32-TS |

**OPINION AND ORDER**

The Plaintiff Union and the Defendant Company dispute the scope of a Neutrality Agreement that they executed to govern their conduct during the Union's organizing campaigns. The Union filed this lawsuit to compel the Defendant to arbitrate whether the Agreement applies to the Company's Auburn, Indiana, plant. The Company contends that the Neutrality Agreement containing the arbitration clause was modified by a side agreement that limits its application to only four plants, the Auburn facility not included. Therefore, the Agreement, including the arbitration clause, is not applicable and the dispute is not subject to arbitration.

Both parties have moved for summary judgment. The Company submits that the Court can determine, as a matter of law, that the Union and the Company agreed that the Neutrality Agreement would only apply to four of the Defendant's facilities. The Union argues that any oral amendment to the Neutrality Agreement would not be operative and that, in any event, it never agreed to limit the scope of the Agreement. The Union moves for summary judgment on the grounds that the arbitration clause in the Neutrality Agreement encompasses the parties' dispute over the scope of the Agreement and, in the alternative, that any modifications to the Agreement

had to be in writing. The Union also moves to strike the report and deposition testimony of the Company's expert, John Toner.

## BACKGROUND

On September 27, 2005, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (formerly the United Steel Workers Union) presented TriMas Corporation with a grievance over the scope of the parties' Neutrality Agreement. The Union stated its position that the Neutrality Agreement applied to all "covered workplaces" as defined in the Agreement and also stated its intention to seek arbitration if their dispute was not resolved. The Company disagreed with the Union's position and refused to arbitrate the dispute. On February 1, 2006, the Union filed a Complaint under Section 301 of the Labor Management Relations Act to compel TriMas to arbitrate the parties' dispute. On April 10, 2006, TriMas filed its Answer asserting its position that the Neutrality Agreement and its arbitration provision did not have any application outside the four facilities to which the parties agreed the contract would apply.

On November 14, 2006, TriMas moved for summary judgment on the basis that the Neutrality Agreement, including the arbitration clause, did not apply to the TriMas facility involved in the dispute. The Company submitted that the Agreement had been modified to limit its coverage to only four TriMas facilities and that the Union had agreed that it would not attempt to organize at its other facilities unless the parties made further modifications to the Agreement. The Company argued, in the alternative, that if a factual dispute regarding the scope of the Agreement existed, the Court should not compel arbitration but order a trial. On this same

2

date, the Union filed its own motion for summary judgment. It asserted that the Company breached the Neutrality Agreement when it refused to arbitrate the dispute over the scope of the Agreement and requested that the Court compel arbitration. Alternatively, it submitted that summary judgment was appropriate because any amendments or modifications to the Neutrality Agreement would not be effective because they were not in writing as required by an integration clause in the Agreement.

On December 18, the parties filed response briefs. The Union also moved to strike the expert report and deposition of John Toner, which the Company had submitted in support of its motion for summary judgment. On January 5, 2007, the parties filed their reply briefs and the Company opposed the Union's Motion to Strike. The Union replied on January 16, 2007.

## STANDARD OF REVIEW

Both parties have moved for summary judgment. The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must

reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *Abrams v. Walker*, 307 F.3d 650, 653 (7th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

## STATEMENT OF FACTS

In 1999, David Stockman formed Heartland Industrial Partners, an investment banking fund concentrating on industry in the Midwest. Realizing that the companies he intended to purchase were heavily unionized or conducive to union organizing, Stockman contacted Ron Bloom, Special Assistant to the President of the USWU, to discuss an agreement on neutrality. This agreement would govern both parties' conduct during organizing drives at the Company's facilities. It was the Union and the Company's intent that the agreement would exemplify their relationship as one based upon constructive cooperation.

4

In November 2000, Heartland signed a Neutrality Agreement with the USWU. The Heartland Neutrality Agreement consists of a letter between Stockman and USWU President George Becker together with a document entitled Framework for a Constructive Bargaining Relationship. The Agreement sets forth the organizing procedures that the parties agreed to follow upon the Union's written notice to the Company that it intended to conduct an organizing campaign at one of its facilities. (Framework Agreement, § C.) The basic principle of the Neutrality Agreement is that Heartland will remain neutral during the Union's efforts to organize non-represented employees and will recognize the Union on a majority card check. In exchange, the Union agrees to limit the number of organizing campaigns it will conduct and to refrain from misrepresenting facts or demeaning the integrity or character of the Company or its representatives.

The Heartland Neutrality Agreement requires that, upon the Union's notification to Heartland of its intent to organize a facility that is a "Covered Business Enterprise" (CBE), Heartland will direct the CBE to execute its own neutrality agreement with the USWU. It also provides that once a business meets the definition of a CBE, the Heartland Neutrality Agreement becomes binding on that enterprise. Whether a particular entity is a CBE under the Agreement depends on Heartland's percentage of ownership or control of that entity. Section E of the Framework Agreement sets forth the rules with respect to affiliates, parents, and ventures and defines each term. It provides that the Company will cause all existing parents, affiliates, and ventures to become parties to the Framework Agreement. The Side Letter provides that it, along with the Framework Agreement, are a "total expression of the parties' intent and can be modified only in writing." (11/7/00 Side Letter, ¶ 16.)

5

In 2000, Heartland obtained control of a company called Metaldyne Corporation. Pursuant to the Heartland Neutrality Agreement, Metaldyne executed its own neutrality agreement with the USWU in 2001. The USWU's first organizing drive of a Metaldyne plant in Ohio was successful and uneventful. However, in late 2001 and early 2002, the Union's efforts to organize a plant in Hamburg, Michigan, left both the company and the Union dissatisfied. Heartland officials contended that they should have had more input on the selection of Hamburg as an organizing target and the Union felt that Metaldyne did not demonstrate proper neutrality during the campaign.

As a result of the friction created by the Hamburg campaign, Stockman and Bloom discussed ways that problems could be avoided in future drives. Stockman believed that certain plants were more receptive to union organizing and that others were not good targets because of strong anti-union sentiment, close associations with other unions, or other reasons. Stockman created a list of facilities that he considered good opportunities for successful USWU organizing drives. The Union orally agreed that it would organize the facilities suggested by Stockman in a particular sequence in exchange for Stockman's agreement that he would sensitize management at these companies to a position of neutrality.

Representatives from the Company and the Union engaged in numerous discussions with each other regarding the proposed sequencing. Stockman also discussed which plants would be targeted and the sequence in which they would be targeted with the executives of the various companies under Heartland's control. Meanwhile, Bloom discussed the plants that had been identified by Stockman with the USWU's Director of Organizing, Stan Johnson. According to the Company's version of events, the purpose of these discussions was to come to an agreement

6

that would limit the facilities that the Neutrality Agreement applied to, excluding some facilities altogether. According to the Union, it only agreed, conditionally, to follow the suggested sequence, but not to exclude any entities that were otherwise covered under the Agreement. The Union contends that the Heartland facilities that were excluded from the agreed list were considered to be excluded only for purposes of the initial sequencing schedule.

Discussions continued until Fall 2002. The senior company executives and USWU officials Bloom and Johnson scheduled to meet at a site near the Detroit airport on October 31, 2002, to discuss the agreement.[1] Before the Airport Meeting, Stockman prepared a memorandum outlining his understanding of the Heartland controlled plants that would be subject to the Heartland Neutrality Agreement, and which plants would not be, and the sequence in which they would be targeted. Three of the plants identified as being covered by the Neutrality Agreement and included in the group of plants in the Union's organizing sequence—Goshen, Indiana, Wood Dale, Illinois, and Longview, Texas—were TriMas facilities.[2] The Company contends that the memorandum was presented to Company and USWU officials, who all agreed with the plan. According to Company witnesses, the USWU agreed to limit their organizing efforts to the plants identified as appropriate targets and that all other plants were excluded from the Neutrality Agreement. The USWU witnesses contend that the Union only agreed to the sequence in which plants would be targeted and that it did not agree to restrict the scope of the Agreement to a certain number of plants. The Airport Memorandum was not signed and no other written

---

[1] The parties have since designated this "the Airport Meeting."

[2] TriMas was a diversified holding company with five operating segments. It was a part of Metaldyne before it became a separate and distinct entity in June 2002.

agreement was executed as a result of the meeting.[3]

In July 2003, TriMas executed its own Neutrality Agreement with the USWU. Again, the Agreement consisted of two complementary documents: a letter, from Grant Beard, the President and CEO of TriMas, to Leo Gerard, the President of the USWU; and a Framework Agreement. The TriMas Neutrality Agreement generally followed the language of the Heartland Neutrality Agreement. It provided that TriMas was entering into the Agreement as a "Covered Business Entity of Heartland Industrial Partners" as defined in the 2000 Heartland Neutrality Agreement. (7/11/03 Side Letter from Stockman to Becker at 1.) A Covered Workplace was defined as any workplace that was controlled by the Company and employed employees who were eligible to be represented by a labor organization. The Company was defined to include TriMas and other business enterprises in which it owned more than 50% of the common stock, controlled more than 50% of the voting power, or had the power to direct the management and policies of the enterprise. Workplaces where another union represented more than 33% of employees eligible for unionization and represented more than twice as many employees as the USWU would have to meet certain requirements before the Neutrality provisions of the Framework Agreement would take effect. Section G of the Framework Agreement, entitled "Dispute Resolution," provided that "[a]ny alleged violation or dispute involving the terms of this Framework Agreement" could be brought to a joint committee consisting of one representative from both TriMas and the Union. If the dispute could not be satisfactorily resolved by the parties, either

---

[3] Both parties have retained an expert. John J. Toner, TriMas's expert, has prepared a report that addresses the validity of side agreements in labor law, including oral side agreements. After reviewing the specific facts of this case, Toner concluded that the parties reached an oral understanding at the October 31 Airport Meeting that modified the terms of their written agreement on neutrality and that this understanding resulted in certain plants being excluded from the Neutrality Agreement. The Union has moved to strike Toner's report and deposition testimony on the basis that his opinions are not relevant or reliable.

party "may submit such dispute to an Arbitrator" for a hearing to be held within ten days. The Side Letter indicated that the Letter and the Framework Agreement were the total expression of the parties' intent and could only be modified in writing.

The USWU organized the Goshen, Wood Dale, and Longview facilities per the parties' sequencing schedule. During the Goshen drive, the parties modified the TriMas Neutrality Agreement with a "Memorandum of Understanding regarding the Union's Organizing Campaign at the Company's Goshen, IN facility" that extended the time set forth in the Framework Agreement for completion of the organizing drive. This modification applied to the Goshen facility only.

In Summer 2004, the USWU provided notice to TriMas that it was going to conduct a campaign at TriMas's Frankfort, Indiana, plant under the terms of the TriMas Neutrality Agreement. The Company replied that the Neutrality Agreement did not apply to Frankfort because it was not on the list of targeted facilities. The Union filed a grievance under the dispute resolution portion of the Agreement and sought arbitration. After the Company declined to arbitrate the scope of the Agreement, the Union filed a lawsuit to compel arbitration. The lawsuit was resolved when TriMas and the Union entered a Settlement Agreement on April 7, 2005, in which the Union agreed to dismiss its federal lawsuit to compel arbitration and the Company agreed to allow the Union to conduct an organizing campaign at Frankfort pursuant to the terms of the Side Letter and Framework Agreement. The Settlement Agreement stated that the settlement did not prejudice TriMas's position in any other situation involving the USWU's organizing efforts under the Neutrality Agreement and that, likewise, the USWU's position was not prejudiced.

In 2005, the Union expressed its interest in conducting an organizing drive at Reike, a TriMas plant in Auburn, Indiana. TriMas believed that the Neutrality Agreement did not apply to Reike because it was not one of the four TriMas facilities the Union agreed to target. On September 27, 2005, the Union filed a grievance and demanded arbitration:

> The Neutrality Agreement is applicable to all "covered workplaces" of the Company (as defined in the Agreement) without exception including but not limited to the Houston, TX, Auburn, IN and Mosinee, WI facilities. Unless the Company resolves this matter to the USW's satisfaction by acknowledging the applicability of the Neutrality Agreement to all "covered workplaces" (as defined in the Agreement) without exception including but not limited to the above-listed facilities, we intend to take this violation to an Arbitrator for resolution.

(DE 22-6.) When the Company disagreed with the Union's position regarding the scope of the Agreement and refused to arbitrate the grievance, the Union filed this lawsuit for breach of the arbitration provision of the Neutrality Agreement.

## DISCUSSION

"Whether an issue is subject to arbitration is a simple matter of contract interpretation." *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002) (citing *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir.1999)). Whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is an issue for judicial determination. *AT & T Techs., Inc.* v. *Comm'ns Workers of Am.*, 475 U.S. 643, 648–50 (1986) "If the contract is ambiguous, 'doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Welbourn*, 301 F.3d at 639 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) and *Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir.1998)). When a contract contains an arbitration clause, a presumption in

10

favor of arbitration exists such that an "order to arbitrate should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT &T Techs.*, 475 U.S. at 648–50. However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Id.* In addition, a court must avoid ruling on the potential merits of any underlying claims when deciding whether parties have agreed to submit a particular grievance to arbitration. *Id.*

In this case, the parties dispute whether the subject matter of the grievance is one that the parties contractually agreed to submit to arbitration. The dispute resolution section of the Agreement applies to "[a]ny alleged violation or dispute involving the terms of this Framework Agreement." (Framework Agreement, Section G.) The parties' dispute is whether the Neutrality Agreement applies to the Auburn facility. The Union believes that the Neutrality Agreement applies to Reike because it is a "covered business entity" and a "covered workplace." The Company disagrees and argues that parties modified the scope of the Agreement so that it applied only to four TriMas facilities.

The arbitration clause is broadly worded; it refers to "any" dispute "involving" the terms of the Agreement. The Union submits that this language is unambiguous and commands arbitration of their grievance because the dispute requires an interpretation of what constitutes a covered workplace, a term that is defined in the Framework Agreement. In response, the Company argues that the Union has simplified the issue and ignores the ambiguities that exist in the Neutrality Agreement. (DE 26 at 10.) However, the ambiguities that the Company refers to are not directed at the dispute resolution provision. Instead, its focus is on whether the scope of

11

the Agreement is ambiguous given the terms and definitions used throughout. It submits that, under the terms of the Agreement, the "specific plants [that] are subject to the specific terms of the neutrality agreement remains ambiguous at best," (DE 26 at 10) and that more than one interpretation exists for key terms used in the Agreement (DE 26 at 11). Therefore, the Company argues, extrinsic evidence is required to determine the scope of the Agreement.

However, whether the Agreement applies to all "Covered Workplace[s]"or is limited, as the Company contends, to only four of the Company's facilities goes to the merits of the underlying claim, which is not before this Court. As long as the parties' dispute involves the terms of the Agreement, it is a matter for arbitration and it is not for this Court to decide if the contract terms regarding covered facilities is ambiguous. Neither party has submitted evidence that the arbitration clause means something other than what it appears to mean on its face: that any dispute involving the terms of the Agreement that are not resolved by the parties may be submitted to arbitration. The Company's only argument that the dispute does not involve a term of the Framework Agreement is that "[a] dispute over the applicability or scope of the Neutrality Agreement to a specific plant operated by TriMas would not be a violation of the Framework Agreement. Instead it is an issue of coverage of the Neutrality Agreement itself—an issue that correctly belongs to this Court." (DE 26 at 13.)  The Court takes the Company to be arguing that it is for the Court, not an arbitrator, to determine whether the parties agreed to arbitrate a particular dispute. The Court agrees with this statement of law. *See AT & T Techs.*, 475 U.S. at 649 ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").  But the Court does not agree with the Company's application of this legal principle to this case. An arbitrator

deciding the Union's grievance would be called upon to interpret the terms of the Neutrality Agreement to ascertain whether it applied to the Auburn plant, among others, not to determine whether the dispute over coverage terms is subject to arbitration.

The parties unambiguously agreed to arbitrate all disputes involving the terms of the Agreement. Further, the issue of which facilities are covered by the contract is one "involving the terms" of the contract. "No more is required to establish the arbitrability of the dispute." *Air Line Pilots Ass'n v. Midwest Exp. Airlines*, 279 F.3d 553, 555 (7th Cir. 2002) (determining that grievance that was based on interpretation of contract provision was covered by arbitration clause and merits of grievance were for the arbitrator).

Even if the parties modified their original Neutrality Agreement with an oral side agreement, as the Company contends, there is no evidence that they took steps to narrow the reach of the arbitration clause so that disputes regarding which plants were covered would be excluded from arbitration. It is true, but irrelevant, that if the parties modified the Neutrality Agreement to limit its application to four TriMas plants that the Union's grievance does not have merit. But merit, including whether extrinsic evidence is needed, is for an arbitrator to decide, not the Court. *See Air Line Pilots Ass'n*, 279 F.3d at 555 (noting that it was not relevant to the issue of arbitrability whether a settlement agreement provision barring an employee from filing any grievance survived the making of collective bargaining agreement that contained a broad arbitration provision). Even disputes involving the scope or validity of the contract in which the arbitration clause is imbedded are for the arbitrator. *Id.* at 556 (stating that "when an arbitration clause is so broadly worded that it encompasses disputes over the scope or validity of the contract in which it is embedded, issues of the contract's scope or validity are for the

13

arbitrators").

The Court notes that some circumstances require a court to address the merits of a dispute in order to rule on the issue of arbitrability. *See Stevens Const. Corp. v. Chi. Reg'l Council of Carpenters*, 464 F.3d 682, 686–87 (7th Cir. 2006) (holding that where a court's decision on arbitrability collapses into the same inquiry as the decision on the merits, the court may need to touch on the merits of an issue that ordinarily would be decided in arbitration); *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO*, 422 F.3d 522, 528 (7th Cir. 2005) (holding that it was proper for the court to determine whether the arbitration agreement expired in order to determine whether a valid contract requiring arbitration existed between the parties). In *Stevens*, the union claimed that the company was violating the parties' 2004 collective bargaining agreement (CBA). The company submitted that it had properly terminated the 1999 CBA and was not a party to the 2004 CBA, which had been negotiated by an employer's association from which the defendant company had successfully withdrawn. The union appealed the district court's determination that the company had properly terminated the 1999 CBA and was not bound by the 2004 CBA, arguing that the district court improperly determined the merits of the underlying dispute. The Seventh Circuit held that it was permissible for the court to determine whether the company had terminated the 1999 CBA because it was necessary to determine whether a valid arbitration agreement existed between the parties pursuant to the 2004 CBA. 464 F.3d at 686–87.

In *Zurich American Insurance Co. v. Watts Industries, Inc.*, 466 F.3d 577, 580 (7th Cir. 2006), it was not necessary for the court to touch upon the merits of the dispute despite the defendant's argument that the preclusive effect of a state court judgment barred the plaintiff's

14

attempt to compel arbitration. The Seventh Circuit held that the court properly left the preclusion issue to the arbitrator after determining that there was a dispute between the parties implicating the otherwise valid arbitration agreement. *Zurich*, 466 F.3d at 581.

In this case, like in *Zurich*, a determination of the merits is not necessary to conclude that a valid arbitration clause covers the subject matter of the dispute. The Company does not dispute that it has a valid agreement that contains a broad arbitration provision—it only challenges the scope of that Agreement. This distinguishes the matter from *Stevens* where the existence of a binding contract between the parties was questioned. In fact, the court in *Stevens* was not even required to interpret the 2004 CBA, the contract that was the subject of the underlying dispute, to determine that no contract existed. Here, the Court is able to address the arbitrability question without addressing the underlying merits of the dispute, which it leaves to the arbitrator.

The presumption in favor of arbitration has not been overcome in this case. It cannot be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the parties dispute regarding which plants are within the scope of the Neutrality Agreement. To compel arbitration, a party need only show: (1) an agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal by the opposing party to proceed to arbitration. *Zurich Am. Ins. Co.*, 466 F.3d at 580. These elements have been met in this case and the Union is entitled to judgment as a matter of law. The Company's Motion for Summary Judgment is denied and the Union's Motion to Strike is rendered moot.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment [DE 20] is

DENIED, the Plaintiff's Motion for Summary Judgment [DE 22] is GRANTED, and the Plaintiff's Motion to Strike [DE 27] is DENIED as MOOT. Judgement will be entered in favor of the Plaintiff and against the Defendant and the Defendant is ORDERED to arbitrate the Plaintiff's grievance according to the terms of the parties' contract.

SO ORDERED on February 22, 2007.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION
